UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

Y.H., a minor by and through his next
friend H.H.;
Y.P., a minor by and through her next
friend R.F.;
H.C., a minor by and through her next
friend N.T.;

    Plaintiffs,

      v.

MELISSA AVILES-RAMOS, Chancellor
of the New York City Department of
Education, in her official capacity,
the NEW YORK CITY DEPARTMENT
OF EDUCATION,
the CITY OF NEW YORK,

    Defendants.
--------------------------------------------------------X

Civil Action No.


**COMPLAINT**

## PRELIMINARY STATEMENT

1. Y.H., Y.P., and H.C. (together, "Plaintiffs")[1] bring this action against Melissa Aviles-

Ramos, in her official capacity as Chancellor of the New York City Department of Education; the

New York City Department of Education; and the City of New York (collectively, "Defendants")

to challenge the constitutionality of the burden of proof applied in school disciplinary hearings for

long-term suspensions. Under the "substantial and competent evidence" standard currently applied,

Defendants are not even required to show that it is more likely than not that the alleged misconduct

---

[1] Pursuant to Fed. R. Civ. P. 5.2, the plaintiffs, who are all minors, are identified by their initials to protect their privacy. Their parents are also identified by their initials because doing otherwise would in effect identify the plaintiffs and defeat the purpose of Rule 5.2.

occurred before students are suspended.  This standard effectively shifts the burden to students to prove that they did not engage in the alleged misconduct.

2. At Plaintiffs' disciplinary hearings, the evidence presented that Plaintiffs did not engage in the alleged infraction was at least as strong as the evidence that they did, and yet under the minimal burden of proof applied, each long-term suspension was sustained. Plaintiffs lost school days, special education services, school breakfast and lunches, and the opportunity to participate in extracurricular activities and significant school events. In addition, they suffered reputational and emotional harm that continues to this day. Because Plaintiffs continue to attend New York City public schools, they remain vulnerable to suffering these harms again in possible future suspension proceedings.

3. The application of the "substantial and competent evidence" standard deprives Plaintiffs of property and liberty interests bound up in their education without due process of law, in violation of the Fourteenth Amendment of the United States Constitution.

4. This action is brought pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief and to recover damages for violations of Plaintiffs' rights arising out of this unconstitutional burden of proof.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

6. Declaratory and injunctive relief are authorized by 28 U.S.C. § 2201(a) and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

7. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the New York City Department of Education has its principal office in the Southern District of New York. The individual

defendant is sued in her official capacity as a New York City Department of Education official and, upon information and belief, is a resident of New York.

8. This action is commenced within the limitation periods governing actions as to cause of action under 28 U.S.C. § 1983, as to all Defendants.

## PARTIES

### *Plaintiffs*

9. Plaintiff Y.H. is an 8th grade student in District 21 of New York City Public Schools.

10. Plaintiff Y.P. is a 9th grade student in District 20 of New York City Public Schools.

11. Plaintiff H.C. is a 7th grade student in District 8 of New York City Public Schools.

### *Defendants*

12. Defendant Melissa Aviles-Ramos, sued in her official capacity, serves as the Chancellor of the New York City Department of Education and is responsible for the operations of the New York City Department of Education. Defendant Aviles-Ramos has the power and duty to perform any duty imposed upon the New York City Department of Education, including the operation of all general education and special education programs and services. At all times relevant to the events described herein, Defendant Aviles-Ramos acted under color of law of the State of New York and in her capacity as agent, servant, and employee of defendant New York City and/or the New York City Department of Education, and within the scope of her employment as such.

13. Defendant New York City Department of Education is a department within the New York City government that manages New York City Public Schools, which is the largest school district in the United States. It maintains its principal place of business at 52 Chambers Street, New York, New York 10007. The New York City Department of Education is responsible for administering New York City's 1,596 public schools, which operate in all five boroughs of New York City and

3

are attended by approximately 912,064 New York City schoolchildren.[2] Defendants Aviles-Ramos

and the New York City Department of Education are collectively referred to as "NYC DOE"

herein.

14. Defendant City of New York is a municipality within New York State and maintains the

offices of its Corporation Counsel at 100 Church Street, New York, New York, 10007. The

Chancellor of the New York City Department of Education is appointed by the Mayor of the City

of New York.

## JURY DEMAND

15. Plaintiffs demand trial by jury in this action on each and every one of their claims.

## LEGAL FRAMEWORK

16. The Fourteenth Amendment to the United States Constitution protects individuals from

deprivation of life, liberty, or property without due process.

17. Fifty years ago, the Supreme Court in *Goss v. Lopez*, 419 U.S. 565 (1975), recognized that

a state law establishing a right to a public education triggers cognizable property and liberty

interests in that education protected by the United States Constitution's due process guarantees.

18. 42 U.S.C. § 1983 establishes a private cause of action against any person who acts under

color of state law to deprive individuals of "any rights, privileges, or immunities secured by the

Constitution and laws" of the United States.

19. Article XI, Section 1 of the New York State Constitution affords students of the State of

New York the right to a sound basic education.[3]

### *The New York City School Disciplinary Process*

---

[2] *DOE Data at a Glance,* NYC PUBLIC SCHOOLS, https://www.schools.nyc.gov/about-us/reports/doe-data-at-a-glance [https://perma.cc/9R7S-YTRY] (last visited May 3, 2025).
[3] *See Bd. of Educ., Levittown Union Free Sch. Dist. v. Nyquist*, 57 N.Y.2d 27, 48 (1982); *Campaign for Fiscal Equity, Inc. v. State*, 86 N.Y.2d 307, 314-19 (1995).

20. The New York City school disciplinary process is governed by New York State Education Law § 3214 and New York City Chancellor's Regulation A-443. All disciplinary action of students with disabilities must adhere to the protections of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et. seq.

<u>New York State Education Law § 3214</u>

21. In New York State, the board of education, board of trustees, superintendent of schools, or principal of a school may suspend the following student: "a pupil who is insubordinate or disorderly or violent or disruptive, or whose conduct endangers the safety, morals, health or welfare of others."[4]

22. No student may be suspended for longer than five school days "unless the student and the person in parental relation have had an opportunity for a fair hearing, upon reasonable notice, with the right of representation by counsel and to question witnesses and to present witnesses and other evidence."[5]

23. The superintendent, or a designated hearing officer, must conduct the hearing. A record of the hearing must be maintained. The hearing officer then makes findings of fact and recommendations as to the appropriate measure of discipline.[6]

24. A student has the right to appeal the decision to the board of education who makes its decision solely upon the record before it.[7]

25. Students with disabilities may be suspended or removed from their current educational placement for violation of school rules only in accordance with the procedures established in §

---

[4] N.Y. EDUC. L. § 3214(3)(a).
[5] N.Y. EDUC. L. § 3214(3)(c)(1).
[6] *Id.*
[7] *Id.*

3214, regulations of the commissioner, 20 U.S.C. § 1415(k), and the federal regulations implementing § 1415(k).[8]

Chancellor's Regulation A-443

26. Chancellor's Regulation A-443 was issued on March 5, 2004, and applies to all New York City Public Schools.

27. Chancellor's Regulation A-443 III.B defines a suspension as the "temporary removal of a student from the regular school program because his/her behavior negatively affects the health, safety, welfare and/or morals of others."[9] The same paragraph notes that "[s]uspension is a serious step and school officials must use appropriate alternative measures to avoid it, if possible."[10]

28. Chancellor's Regulation A-443 III.B.3 details the procedural requirements for suspensions greater than five days, called "Superintendent's Suspensions."

29. When a student engages in conduct for which a Superintendent's Suspension may be warranted, the principal must take the following investigatory steps: "(1) question the victim and any other witnesses to the incident and obtain their signed written statements; (2) question the accused student and inform him/her of the misconduct of which he/she is being accused; (3) provide the accused student with an explanation of the evidence and an opportunity to present his/her side of the event, unless it is not feasible to do so; and (4) provide the accused student with an opportunity to prepare a signed, written statement." If, after taking these steps, the principal believes a Superintendent's Suspension is warranted, "he or she shall notify the Superintendent, provide complete details of the student's behavior, including mitigating circumstances, and the investigative steps that were taken, and request a suspension. A Superintendent's Suspension may

---

[8] N.Y. EDUC. L. § 3214(3)(g).
[9] . N.Y.C. DEP'T OF EDUC., REGULATION OF THE CHANCELLOR A-443: STUDENTS DISCIPLINE PROCEDURES § III.B. (2004) [hereinafter "Chancellor's Regulation A-443"].
[10] Id.

not be authorized until there has been assurance that the principal has conducted the preliminary investigation."[11]

30. If the suspension is authorized, the school must give immediate written notice of the suspension to the student's parent, which shall include, among other things, (1) the fact that the student has been suspended and the duration of the suspension; (2) the specific reasons for the suspension including the date, time and place of the incident; (3) the alternative education arrangements that have been made; (4) the date, time, and place of the hearing; (5) the fact that the parent may plead no contest to the charges and that such plea will result in waiving the suspension hearing; (6) the right to view and obtain a copy of the student's records, and all written statements relating to the incident which led to the suspension; (7) the right to, "and the advisability of", representation by an advisor or counsel; (8) the names of adult and student witnesses who may be expected to testify on behalf of the school; (9) the right to question witnesses, present witnesses and documentary evidence on the student's behalf; (10) the right to appeal the suspension decision; and (12) a list of community agencies offering free or low-cost legal assistance.[12]

31. At the hearing, school officials are responsible for proving by direct or circumstantial evidence the student's involvement in the incident charged. However, a finding that the student committed the infraction may not be based exclusively on hearsay evidence.[13] Although no standard of proof is established by statute or regulation, drawing on § 306(1) of the State Administrative Procedure Act ("SAPA"), decisions of the New York State Commissioner of Education, and a 2002 Appellate Division case, *Board of Education of City School District of City of New York v. Mills*, 293 A.D. 2d 37 (2002), hearing officers presiding over suspension hearings

---

[11] *Id.* § III.B.3(e).
[12] *Id.* § III.B.3(n).
[13] *Id.* § III.B.3(s)(10).

apply a "competent and substantial" evidence standard in determining whether the school has met its burden.[14]

32. Once findings of fact have been made as to whether the student committed the act charged, the Superintendent must make a dispositional decision which will include a determination of whether to overturn or sustain the suspension, the length of the suspension, and how long the suspension will remain on the student's record. Mitigating circumstances must be considered in making a dispositional decision.[15] The parent must be informed within two school days of the dispositional decision. The parent must also receive a full report of the findings and disposition within five school days of the hearing.[16]

33. If the charge is sustained, the disposition can range anywhere from immediate reinstatement to expulsion from the New York City Public School System, with most students receiving a suspension of between 5 and 20 school days.[17]

34. If the charge is sustained, disposition with respect to the student's record may include notation of the suspension on the student's permanent record, with the potential for expungement of the record upon graduation, permanent departure from the New York City public school system, or at some event/time in the future.[18]

---

[14] *See Matter of Board of Education. of City School Dist. Of City of N.Y. v. Mills*, 293 A.D. 2d 37, 38-40 (2002). In concluding that "substantial and competent evidence" standard was constitutionally permissible, the court's analysis erred by 1) conflating the standard imposed by reviewing courts on appeal with that applied by finders of fact; 2) finding that the standard is "imposed by statute" in reference to the SAPA, when the Act merely references it as an available option in administrative proceedings; 3) finding that school discipline hearings fail the "stigma plus" test, a test wholly inapplicable in this context given the clear property interests students have in their education; and 4) concluding, without engaging in any meaningful *Mathews v. Eldrige* balancing analysis, that the "use of the competent and substantial evidence standard [does not risk] an erroneous deprivation of the student's liberty and property interests." *Id.* at 40.

[15] Chancellor's Regulation A-443 § III.B.3(u).

[16] *Id.*

[17] *See* N.Y.C. DEP'T OF EDUC., CITYWIDE BEHAVIORAL EXPECTATIONS TO SUPPORT STUDENT LEARNING GRADES 6–12, at 14, 26-27 (2019) [hereinafter "Citywide Behavioral Expectations"].

[18] Chancellor's Regulation A-443 § III.B.3(w)(1-4).

35. During the suspension, the student "may not be penalized academically."[19] The student must be provided with alternative instruction. This instruction "must provide the student with an opportunity to continue to earn academic credit and must be appropriate to the individual needs of the student."[20]

36. Elementary and middle school students awaiting a suspension hearing must be provided with a full-time instructional program, and high school students must be provided with a minimum of three hours per day of instruction.[21] This instruction may be provided before school hours, after school hours or during school hours. Once the suspension hearing has been held, all students must be provided with a full-time instructional program.[22]

37. A student may appeal the decision in a Superintendent's Suspension.[51] The Chancellor shall decide an appeal for a suspension based on the record of the hearing and the written decision of the preceding reviewing authority. A decision must be issued within fifteen working days following the completed filing of the appeal record.[23]

38. Chancellor's Regulation A-443 also outlines the required processes and protections for students with disabilities facing disciplinary action.[24]

Continuum of Special Education

39. Students with disabilities are suspended at significantly higher rates than their non-disabled peers, although the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 et. seq., provides additional procedures for these students prior to and during disciplinary exclusion.[25]

---

[19] *Id.* § III.B.1(a).
[20] *Id.* § III.B.1(b).
[21] *Id.* § III.B.1(e); *See also* N.Y. Dep't of Educ., Opinion Letter (Oct. 10, 2023), https://www.counsel.nysed.gov/sites/counsel/files/243.pdf [https://perma.cc/X2UQ-99D3].
[22] *Id.* § III.B.1(f).
[23] Chancellor's Regulation A-443 § III.B.1-3.
[24] *Id.* at § II.
[25] *See infra* ¶ 57.

40. The IDEA requires all schools to provide a free appropriate public education ("FAPE") to children with disabilities designed to meet their unique needs.[26] To ensure the provision of a FAPE, all school districts must provide special education and related services "reasonably calculated to enable the child to receive educational benefits."[27]

41. To administer these services, school districts must create an individualized education program ("IEP") for each student with a disability. An IEP is a document created annually that notes the student's present educational performance, outlines goals for the student to meet to improve that performance, and describes the specifically designed special education and related services, such as counseling, occupational therapy, and speech and language therapy, that will support the student in reaching those goals.[28] The IEP also notates the classroom program for the student, which must be the least restrictive environment that allows a student to make meaningful progress.[29]

42. To qualify for services under the IDEA, a child must have a disability that adversely affects his or her educational performance.[30] The child then is classified as falling under one of 13 disability categories.[31]

43. Before suspending a student with a disability, principals must consult the New York City Schools Discipline Code, as well as the student's IEP, behavioral intervention plan ("BIP"), and

---

[26] 20 U.S.C. § 1400(d)(1).
[27] *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007).
[28] *See D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006).
[29] *See* 20 U.S.C. § 1412 (a)(5)(A). These settings include general education classrooms, integrated co-teaching ("ICT") classrooms where half of the students are general education students and half of the students are those with disabilities, and smaller classroom sizes in both community and specialized schools with ratios such as 12, 8, or 6 students to one teacher.
[30] *See* N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(zz).
[31] *See id.*

504 Accommodation Plan to determine if a "disciplinary change in placement" is an appropriate disciplinary response.[32]

44. A disciplinary change in placement for purposes of the IDEA occurs when a student with a disability either (1) receives a suspension that is greater than 10 consecutive school days or (2) is subjected to a series of classroom removals or suspensions constituting a pattern which results in the student being excluded from his or her classroom for more than 10 school days in the school year.[33]

45. During the first 10 days of the disciplinary change in placement, special education students are not entitled to receive any special education services.[34]

46. Every time a disciplinary change in placement occurs, the school district is required to hold a manifestation determination review ("MDR").[35] The purpose of an MDR is to determine (1) whether the conduct for which the student was suspended was caused by, or had a direct and substantial relationship to, the student's disabilities and (2) whether the conduct was the direct result of the school's failure to properly implement a student's IEP.[36] If the answer to either question is yes, the student must be immediately returned to the school placement from which they were removed.[37]

47. The addition of an MDR to the school disciplinary process delays the issuance of the decision as to whether the suspension has been sustained and often delays the student returning to school. NYC public schools do not hold the MDR until the suspension hearing has been held, most

---

[32] *See* Chancellor's Regulation A-443 § III.B.3 (a).
[33] *See id.* § II.C.5.
[34] *See id.* § II.C.2-3.
[35] *See* §§ 201.2(e), 201.4.
[36] *See* 20 U.S.C. § 1415(k)(1)(E).
[37] *See id.* § 1415(k)(1)(F)(iii). There are limited exceptions to this requirement if the student was found 1) in possession of a weapon at school; 2) to have possessed or used or sold or solicited illegal drugs at school; or 3) to have inflicted serious bodily injury upon another person while at school. *Id.* § 1415(k)(1)(G).

frequently 5 days or more after the suspension begins, and they are not required to conduct the MDR until the 10th day of the disciplinary change in placement.[38] Suspension hearing offices will then not issue their determination on the length of the suspension until the school has reported back as to the result of the MDR.

48. Despite additional procedures for students with disabilities, the delayed implementation of such protections obstructs any immediate or meaningful mitigation of the harm caused by their exclusion from their IEP-mandated classroom placement and related services.

## STATEMENT OF FACTS

49. Exclusionary school discipline practices involve punishments that remove students from their classrooms or school environments. Examples include classroom removals, which can last anywhere from one minute to one day; suspensions, where students are removed from their usual class setting for somewhere between a day and a year; and expulsions, where students are permanently removed from their assigned schools.

50. In New York City, classroom removals are called "teacher removals," suspensions of one to five days are called "principal's suspensions," and suspensions longer than five days are called "superintendent's suspensions."[39] Only students at risk of receiving a superintendent's suspension are entitled to the procedural protections described *supra.*

### *History & Current State of Exclusionary Discipline*

51. A boom of exclusionary discipline began with rising fears about school safety that culminated in the passage of the Gun-Free Schools Act of 1994, which required school districts to enact policies mandating expulsion for students found on school property with firearms.[40] By

---

[38] *See* Chancellor's Regulation A-443 § II.E.2.
[39] CITYWIDE BEHAVIORAL EXPECTATIONS at 14.
[40] *See* 20 U.S.C. § 7961 (1994).

1999, 94% of all schools in the United States had adopted "zero-tolerance" policies — a disciplinary approach that favors mandatory and severe punishment regardless of individual circumstances — that expanded far beyond addressing firearm offenses, encouraging the implementation of harsher disciplinary policies for far lesser offenses as well.[41]

52. Nationally, the number of suspensions peaked in the early 2010s. During the 2009-2010 school year, 7% of all students in the United States were suspended, totaling over 3.5 million students, and resulting in over 18 million days of lost instruction.[42]

53. Under President Barack Obama's administration, the United States Department of Education ("US DOE") began to investigate the short- and long-term impacts of exclusionary discipline on suspended students and their peers. In 2011, the US DOE and Department of Justice ("DOJ") launched the Support School Discipline Initiative with the goal of reducing exclusionary discipline in schools.[43] Under this initiative, the Council of State Governments created the 2014 School Discipline Consensus Report, designed to support districts in moving away from zero-tolerance policies and towards research-based, restorative practices.[44] In 2014, the US DOE and DOJ issued a Dear Colleague Letter to assist schools in their administration of student discipline

---

[41] *See* JUSTIN DRIVER, THE SCHOOLHOUSE GATE: PUBLIC EDUCATION, THE SUPREME COURT, AND THE BATTLE FOR THE AMERICAN MIND 145 (2018).
[42] Donna St. George, *Suspended Students Lose Millions of Days of Instruction While Out of School*, WASH. POST (Feb. 23, 2015), https://www.washingtonpost.com/local/education/suspended-students-lose-millions-of-days-of-instruction-while-out-of-school/2015/02/23/1bcab258-b9ec-11e4-aa05-1ce812b3fdd2_story.html.
[43] *See* Press Release, U.S. Dep't of Just., Attorney General Holder, Secretary Duncan Announce Effort to Respond to School-to-Prison Pipeline by Supporting Good Discipline Practices (July 21, 2011),
https://www.justice.gov/archives/opa/pr/attorney-general-holder-secretary-duncan-announce-effort-respond-school-prison-pipeline [https://perma.cc/L927-8KHW].
[44] *See generally* EMILY MORGAN ET AL., JUST. CTR.: THE COUNCIL OF STATE GOV'TS, THE SCHOOL DISCIPLINE CONSENSUS REPORT: STRATEGIES FROM THE FIELD TO KEEP STUDENTS ENGAGED IN SCHOOL AND OUT OF THE JUVENILE JUSTICE SYSTEM (2014),
https://safesupportivelearning.ed.gov/sites/default/files/The_School_Discipline_Consensus_Report.pdf [https://perma.cc/P7LP-CK8A].

without discrimination on the basis of race, color, or national origin.[45] The Letter highlighted the "potential for significant, negative educational and long-term outcomes" such as "school avoidance and diminished educational engagement; decreased academic achievement; increased behavior problems; increased likelihood of dropping out; substance abuse; and involvement with the juvenile justice systems" caused by suspensions that contribute to the school-to-prison pipeline.[46] In 2015, President Obama signed the Every Students Succeeds Act ("ESSA") to replace the No Child Left Behind Act ("NCLB"). While the NCLB had incentivized states to adopt zero-tolerance policies, ESSA created incentives for schools to transition away from exclusionary discipline.[47] As of 2021, thirty-seven states had released guidance encouraging the use of non-punitive alternatives to suspension.[48]

54. The NYC DOE encourages the use of these alternatives in the Mission Statement on School Climate and Safety that opens the Student Discipline Code: "New York City believes that overly punitive methods of discipline are not in the best interests of students, fail to advance school safety, and can harm students' long-term potential."[49] It states that "research has shown that students facing disciplinary measures, and the schools they attend, are better served by providing positive supports that teach students the social, emotional, and behavioral skills necessary to participate and learn."[50]

---

[45] *See* Catherine E. Lhamon, Assistant Sec'y, U.S. Dep't of Educ., Off. of C.R., *Dear Colleague Letter: Disciplinary Practices* (Jan. 8, 2014), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-201401-title-vi.pdf [https://perma.cc/CEV6-5L4W].
[46] *Id.*
[47] *See* MELANIE LEUNG-GAGNÉ ET. AL, LEARNING POL'Y INST., PUSHED OUT: TRENDS AND DISPARITIES IN OUT-OF-SCHOOL SUSPENSION 23 (2022), https://learningpolicyinstitute.org/sites/default/files/2022-09/CRDC_School_Suspension_REPORT.pdf [https://perma.cc/5W6C-8HZ9].
[48] Brian Kelley, Carlos Jamieson, and Zeke Perez, Jr., *50-State Comparison: School Discipline Policies*, EDUC. COMM'N OF THE STATES (May 17, 2021), https://www.ecs.org/50-state-comparison-school-discipline-policies/ [https://perma.cc/9CHQ-RB84].
[49] CITYWIDE BEHAVIORAL EXPECTATIONS at 5.
[50] *Id.*

55. Forty-six states, including New York State, have limitations on the length of suspensions, grade level at which a student can be suspended, or type of violation for which a student can be suspended.[51] In New York City, the NYC DOE implemented a policy that caps most suspensions at twenty school days. Suspensions for more than twenty school days "may be imposed only when required by law or for . . . infractions that involve seriously dangerous and/or violent behavior where the circumstances warrant the imposition of a longer suspension" and to impose such a suspension "require[s] approval by the Senior Executive Director of the Office of Safety and Youth Development."[52] Only general education students aged seventeen or older can be expelled from the New York City Public School System.[53]

56. Despite contemporary understandings about the significant short- and long-term impacts of exclusionary discipline, suspensions continue to be frequently used and disproportionately imposed on Black students and students with disabilities. During the 2023-2024 school year, in New York City public schools, there were 36,539 disciplinary removals, comprised of 8,815 teacher removals, 21,493 principal's suspensions, and 6,231 superintendent's suspensions.[54] Black students accounted for 37% of all disciplinary removals and 45% of all superintendent's suspensions, even though they comprised only 24% of the student population.[55] Students with

---

[51] *See* EDUC. COMM'N OF THE STATES, 50-STATE COMPARISON: SCHOOL DISCIPLINE POLICIES (2021), https://reports.ecs.org/comparisons/school-discipline-policies-03 [https://perma.cc/9PKW-DSN3].

[52] CITYWIDE BEHAVIORAL EXPECTATIONS at 23.

[53] *Id.* at 27.

[54] *See* STUDENT DISCIPLINE – ANNUAL REPORT ON STUDENT DISCIPLINE 2023-2024, https://infohub.nyced.org/docs/default-source/default-document-library/student-discipline---annual-report-on-student-discipline-2023-24435e836e-d776-452c-b9a7-b655d1675be9.xlsx [https://perma.cc/A5YG-CEVC] (last visited Apr. 28, 2025).

[55] *See id.* There is, however, no evidence that Black students misbehave in class more than their white peers. *See* THOMAS RUDD, KIRWAN INST. STUDY RACE & ETHNICITY, RACIAL DISPROPORTIONALITY IN SCHOOL DISCIPLINE: IMPLICIT BIAS IS HEAVILY IMPLICATED 2 (2014), https://kirwaninstitute.osu.edu/sites/default/files/documents/ki-ib-argument-piece03.pdf [https://perma.cc/Z5Y3-DV63]. Instead, the disproportionality "suggests that some form of systematic bias is inherent in the use of school suspension and expulsion." RUSSELL J. SKIBA ET AL., IND. EDUC. POL'Y CTR., THE COLOR OF DISCIPLINE: SOURCES OF RACIAL AND GENDER DISPROPORTIONALITY IN SCHOOL PUNISHMENT 19 (2000), http://www.fixschooldiscipline.org/wp-content/uploads/2020/09/29.Color_of_Discipline.2002.pdf [https://perma.cc/RNU7-BUGL].

disabilities accounted for nearly 40% of disciplinary removals, even though they comprised only 22% of the student population.[56]

### *Impact of Suspensions*

57. While school suspensions were once thought of as minor, necessary punishments to remedy a broad range of student infractions and keep schools safe and effective, they are now seen as often having the opposite impact. Students face wide-ranging harms due to suspensions, from decreased academic performance to greater likelihood of absenteeism, dropout, and future incarceration. In a study of 804 New York City public schools from 2011 to 2013, 61% of disciplined students were chronically absent in the period after their initial suspension, 22% were not promoted to the next grade, and 20% had a future arrest.[57]

---

[56] *See* STUDENT DISCIPLINE – ANNUAL REPORT ON STUDENT DISCIPLINE 2023-2024, https://infohub.nyced.org/docs/default-source/default-document-library/student-discipline---annual-report-on-student-discipline-2023-24435e836e-d776-452c-b9a7-b655d1675be9.xlsx [https://perma.cc/A5YG-CEVC] (last visited Apr. 28, 2025). This disparity becomes the starkest for Black students with disabilities: In a Task Force Report published by the New York State Education Department in 2022, Black male students with disabilities were found to be more than two times more likely to be suspended as their white peers with disabilities, and almost ten times more likely to be suspended as a white student without a disability. SAFE SCHOOLS TASK FORCE REPORT: RECOMMENDATIONS FOR REDUCING DISPARITIES IN AND REFORMING SCHOOL DISCIPLINE IN NEW YORK STATE 4 (2022), https://www.regents.nysed.gov/sites/regents/files/P-12%20-%20Recommendations%20for%20ATT%20-%20Recommendations%20for%20Reducing%20Disparities%20in%20and%20Reforming%20School%20Discipline%20in%20New%20York%20State.pdf [https://perma.cc/7W5M-DVD8]. Similarly, the U.S. Government Accountability Office in 2024 found that Black girls were over five times more likely than their white peers to receive an out-of-school suspension, and Black girls with disabilities were over ten times more likely to receive an out-of-school suspension compared to white girls without a disability. U.S. GOV. ACCOUNTABILITY OFFICE, K-12 EDUCATION NATIONALLY BLACK GIRLS RECEIVE MORE FREQUENT AND MORE SEVERE DISCIPLINE IN SCHOOL THAN OTHER GIRLS, GAO-24-106787, 16 & 19 (September 2024), https://www.documentcloud.org/documents/25152290-gao-nationally-black-girls-receive-more-frequent-and-more-severe-discipline-in-school-than-other-girls/?responsive=1&title=1 [https://perma.cc/V5ST-KWRK]. The US DOE has also recognized that many students with disabilities do not receive the supports in school they need to address disability related behavior, and many are "unnecessarily disciplined more severely than students without disabilities for the same or similar behavior." U.S. DEP'T OF EDUC., OFF. OF C.R., SUPPORTING STUDENTS WITH DISABILITIES AND AVOIDING THE DISCRIMINATORY USE OF STUDENT DISCIPLINE UNDER SECTION 504 OF THE REHABILITATION ACT OF 1973 ii (July 2022), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/504-discipline-guidance.pdf [https://perma.cc/CE5D-VXA2].

[57] LAMA HASSOUN AYOUB ET. AL, CTR. FOR CT. INNOVATION, SCHOOL DISCIPLINE, SAFETY, AND CLIMATE: A COMPREHENSIVE STUDY IN NEW YORK CITY ix (2019), https://www.innovatingjustice.org/wp-content/uploads/2019/10/report_schoolsafety_10252019.pdf [https://perma.cc/R4KW-Z8RN].

58. When students miss school days, they miss critical instructional time as well as time to form positive relationships with teachers and peers, often leading to school disengagement that exacerbates any preexisting behavioral difficulties and mental health concerns the students may have.[58] Just attending a school with more severe discipline policies leads to higher levels of depressive symptoms and substance abuse in the entire student population.[59]

59. School disengagement stemming from suspension leads to further school absences that can develop into chronic absenteeism. The missed classroom time and opportunities to create and maintain positive relationships with peers and teachers immediately impacts a suspended student's grades and likelihood of grade retention. Even just one suspension on average lowers a student's grade point average ("GPA") by close to one full point.[60] Suspended students are nearly 30% more likely to repeat a grade.[61]

60. Exclusionary discipline also has a labeling effect on disciplined students, marking them as troublemakers, which is more likely to lead to further discipline through increased monitoring, the presumption of wrongdoing, and grouping with like-labeled peers.[62]

---

[58] *See* CHRISTINA LICALSI, DAVID OSHER, PAUL BAILEY, BRIEF: AN EMPIRICAL EXAMINATION OF THE EFFECTS OF SUSPENSION AND SUSPENSION SEVERITY ON BEHAVIORAL AND ACADEMIC OUTCOMES 1 (2021), https://www.air.org/sites/default/files/2021-08/NYC-Suspension-Effects-Behavioral-Academic-Outcomes-Brief-August-2021.pdf [https://perma.cc/72FF-L7J5] (Explaining that in a study of New York City Public Schools data from 2009-2018, more severe discipline in the form of out-of-school suspensions appeared to exacerbate misbehavior, as these students exhibited higher rates of behavioral incidents for the four years after the initial incident as compared to their peers who received shorter in-school suspensions).

[59] *See* Seth J. Prins et al., *Longitudinal Relationships Among Exclusionary School Discipline, Adolescent Substance Use, and Adult Arrest: Public Health Implications of the School-to-Prison Pipeline*, 251 DRUG ALCOHOL DEPEND 1, 2 (2023).

[60] *See* Camila Cribb Fabersunne, et. al, *Exclusionary School Discipline and School Achievement for Middle and High School Students, by Race and Ethnicity*, 6 JAMA NETWORK OPEN 1, 7 (2023).

[61] *See* TONY FABELO ET AL., JUST. CTR. COUNCIL OF STATE GOV'TS, BREAKING SCHOOLS' RULES: A STATEWIDE STUDY OF HOW SCHOOL DISCIPLINE RELATES TO STUDENTS' SUCCESS AND JUVENILE JUSTICE INVOLVEMENT xi (2011), https://csgjusticecenter.org/wp-content/uploads/2020/01/Breaking_Schools_Rules_Report_Final.pdf [https://perma.cc/9ERN-KUXL].

[62] *See* Kerrin C. Wolf & Aaron Kupchik, *School Suspensions and Adverse Experiences in Adulthood*, 34 JUST. Q. 407, 413 (2017). The labeling effect impacts both how teachers and administrators see the disciplined student and how the student sees himself, leading to disengagement from school and the disintegration of positive relationships with school staff. *See id.*

61. When students are excluded from school, not only do they miss out on academic and social learning opportunities, but they can also be deprived of nutrition and healthcare to which they are statutorily entitled. The NYC DOE offers free breakfast, lunch, and after school meals to all students, operating the largest daily food program in the country outside of the military.[63] During the 2023-2024 school year, every public school in New York City, according to city officials, had a nurse or school-based health center.[64] During the 2020-2021 school, 400 schools had health clinics that offered mental health services.[65]

62. The provision of meals, health and mental health services at school greatly improves food security and access to healthcare for students and their families.[66] It also leads to improved attendance, behavior, and academic performance.[67] When high poverty middle school districts participated in a program that enabled all students to receive school meals at no charge, they saw their out-of-school suspension rates fall by, on average, 25%.[68] When students are suspended and

---

[63] *See School Meals*, NYC PUB. SCHS., https://www.schools.nyc.gov/school-life/food/school-meals#:~:text=Did%20you%20know%20that%20New,students%20during%20the%20school%20year%3F [https://perma.cc/G34N-K4XQ] (last visited Apr. 25, 2025); *see also* Michael Elsen-Rooney, *Empty Display Cases, Hungry Kids, Disrupted Production: NYC's Cafeteria Cuts Send Shockwaves*, CHALKBEAT (Feb. 6, 2024), https://www.chalkbeat.org/newyork/2024/02/06/new-york-city-school-lunches-budget-cuts-affect-students-manufacturers [https://perma.cc/N5CL-LT5Y].

[64] *See* Julian Shen-Berro, *NYC Schools Could Lose 400 Nurses as Federal Relief Funds Expire*, CHALKBEAT (May 13, 2024), https://www.chalkbeat.org/newyork/2024/05/14/nyc-schools-could-lose-hundreds-of-nurses-as-federal-relief-funds-expire [https://perma.cc/Q6X2-PB7Z].

[65] Reema Amin & Amy Zimmer, *Mental Health Safety Net for Youth: Adams Outlines Vision to Catch Kids in Crisis*, CHALKBEAT (Mar. 2, 2023), https://www.chalkbeat.org/newyork/2023/3/2/23622726/ny-youth-mental-health-schools-services-suicide-prevention-telehealth [https://perma.cc/K773-K7AU]. In 2023, Mayor Eric Adams announced a plan to expand mental health clinics in schools. *See id.* In January 2025, the New York City Council voted to expand youth mental health supports by increasing resources for school-based peer-to-peer programming and student health clubs. *See* Press Release, N.Y. City Council, NYC Council Votes to Expand School-Based Mental Health Support for Students as Next Part of Its Mental Health Roadmap (Jan. 23, 2025), https://council.nyc.gov/press/2025/01/23/2785 [https://perma.cc/B538-AMAR].

[66] *See* FOOD RSCH. & ACTION CTR., SCHOOL MEALS ARE ESSENTIAL FOR STUDENT HEALTH AND LEARNING 1 (2021), https://frac.org/wp-content/uploads/School-Meals-are-Essential-Health-and-Learning.pdf [https://perma.cc/JMH6-6ZAM] (finding that school lunch lifted 1.2 million people above the poverty line in 2017).

[67] *See* LAWRENCE S. BERNSTEIN ET AL., ABT ASSOCS. INC., ACADEMICS & BREAKFAST CONNECTION PILOT: FINAL REPORT ON NEW YORK'S CLASSROOM BREAKFAST PROJECT 1 (2004).

[68] *See* Nora E. Gordon & Krista J. Ruffini, *School Nutrition and Student Discipline: Effects of Schoolwide Free Meals* 17 (NBER Working Paper No. 24986, 2018), https://www.nber.org/system/files/working_papers/w24986/w24986.pdf [https://perma.cc/8HQA-PZA2].

do not attend school, many miss out on their only secure meals of the day as well as critical health services. Without adequate nutrition and needed mental health support, students are more likely to continue to exhibit negative behaviors and continue to be kept out of school, creating a vicious cycle.

63. In New York City, while students await their suspension hearing and for the entire length of the suspension, they are offered an opportunity to attend alternative learning centers ("ALCs"). There are 12 Middle School and 12 High School ALCs in the New York City Schools system, and most students must travel significant distances via public transportation to get to their assigned location; the NYC DOE does not provide busing. There are only four principals designated to lead all 24 ALC schools, and only nine "core staff members" per school.[69]

64. Because these schools are not included in the city's school quality reports, there is little information about their safety or impact on student performance. ALCs are inadequate substitutes for the regular classroom: they are, by their nature, always temporary, and the transient nature of the student population makes it difficult to have any coherent or consistent curriculum. Students return to their home school behind in the curriculum, and oftentimes the credits they earned at the ALC do not transfer. When students are placed in an ALC, their chances of graduating from high school decrease significantly.[70] There is also an increased risk of danger and disruption due to many students with behavioral difficulties being placed together in one setting.

65. The geographic barriers that students face to reach the ALC combined with student and parental concerns about safety and quality of education lead to significantly lower attendance at

---

[69] *Alternate Learning Centers*, NYC PUBLIC SCHOOLS INFOHUB, https://infohub.nyced.org/in-our-schools/programs/district-79/alternate-learning-centers#:~:text=Currently%2C%20there%20are%0a%20total,school%20students%20on%20superintendent's%20suspension [https://perma.cc/SU7Z-PY3C] (last visited Apr. 28, 2025).
[70] *See* Miranda Johnson & James Naughton, *Just Another School?: The Need to Strengthen Legal Protections for Students Facing Disciplinary Transfers*, 33 NOTRE DAME J. L. ETHICS & PUB. POL'Y 69, 75 (2019).

these schools than their regular school counterparts: in the 2018-2019 school year, only 58% of students assigned to an ALC actually attended the program, compared to 92% attendance at schools citywide.[71]

66. Suspended students are much more likely than their peers to never finish high school. Just one suspension in the ninth grade increases two-fold the likelihood that a student will drop out.[72] Once a student has been disciplined by removal over ten times, the likelihood of dropout rises to nearly 60%.[73] Suspensions lower graduation rates not just for the suspended students, but for all students at schools with high suspension rates.[74]

67. The impact of exclusionary discipline does not stop at the proverbial "schoolhouse gate." Suspended students are nearly three times as likely as their non-suspended peers to be in contact with the juvenile justice system the year after the disciplinary incident, and for students suspended over ten times, the likelihood of future incarceration jumps to nearly 50%.[75] The severity of the disciplinary incident does not impact the likelihood of incarceration, demonstrating that the increase is not primarily driven by the underlying behaviors, but rather by the imposition of the suspensions themselves.[76]

---

[71] Alex Zimmerman, *'It's Basically Jail': Inside NYC's Suspension Centers, Where There's Bullying, Boredom – and Sometimes Support*, CHALKBEAT (Apr. 18, 2019), https://www.chalkbeat.org/newyork/2019/4/18/21107994/it-s-basically-jail-inside-nyc-s-suspension-centers-where-there-s-bullying-boredom-and-sometimes-sup [https://perma.cc/ZK4E-Y8ZL].

[72] *See* Robert Balfanz et al., *Sent Home and Put Off-Track: The Antecedents, Disproportionalities, and Consequences of Being Suspended in the Ninth Grade*, J. APPLIED RSCH. ON CHILDREN 2, 13 (2014).

[73] *See id.*

[74] *See* Brea L. Perry & Edward W. Morris, *Suspending Progress: Collateral Consequences of Exclusionary Punishment in Public Schools*, 79 AM. SOCIOLOGICAL REV. 1067, 1082-83 (2014).

[75] *See* TONY FABELO ET AL., JUST. CTR. COUNCIL OF STATE GOV'TS, BREAKING SCHOOLS' RULES: A STATEMENT STUDY OF HOW SCHOOL DISCIPLINE RELATES TO STUDENTS' SUCCESS AND JUVENILE JUSTICE INVOLVEMENT xii (2011), https://csgjusticecenter.org/wp-content/uploads/2020/01/Breaking_Schools_Rules_Report_Final.pdf [https://perma.cc/9ERN-KUXL].

[76] *See* Johanna Lacoe & Matthew P. Steinberg, *Do Suspensions Affect Student Outcomes?*, 41 EDUC. EVALUATION & POL'Y ANALYSIS 1, 56 (2019).

68. The likelihood of future incarceration increases not just for suspended students, but for their peers as well: all middle school students who attend schools with high suspension rates are substantially more likely to be arrested and jailed as adults.[77]

69. Student suspensions predict future civil and political disengagement: excluded students feel marginalized, unheard, and undervalued which encourages the learning of anti-democratic values and behaviors.[78]

70. Student suspensions also economically impact society at large. When students are retained in a grade, their workforce entry is delayed, costing the state over $68 million dollars in one year.[79] The additional years of instruction cost the state nearly $41 million dollars per year.[80]

71. Taken together, these impacts reflect the seriousness of the interests at stake when a student is suspended from school.

### *Facts Regarding the Individual Plaintiffs*

Y.H.

72.  Y.H. is a 13-year-old 8th grade student at IS 96 Bay Academy. When Y.H. was suspended during the 2023-2024 school year, he was a 7th grade student at the same school.

73.  Y.H. is an exemplary student. At the end of the 7th grade, he was receiving A's and B's in all his classes.

---

[77] *See* Andrew Bacher-Hicks et. al, *Proving the School-to-Prison Pipeline: Stricter Middle Schools Raise the Risk of Adult Arrests*, EDUC. NEXT, https://www.educationnext.org/proving-school-to-prison-pipeline-stricter-middle-schools-raise-risk-of-adult-arrests [https://perma.cc/3A6M-2JF2] (last updated July 27, 2021) (finding through examining student data after the redistricting of the Charlotte-Mecklenburg school district in 2002, which led to nearly half of all students in the district changing schools, that students who attend stricter schools are 15% more likely to drop out of high school, 17% more likely to be arrested, and 20% more likely to go to jail).
[78] *See* Kerrin C. Wolf & Aaron Kupchik, *School Suspensions and Adverse Experiences in Adulthood*, 34 JUST. Q. 407, 413 (2017).
[79] MINER P. MARCHBANKS III ET AL., JUST. CTR. COUNCIL OF STATE GOV'TS, THE ECONOMIC EFFECTS OF EXCLUSIONARY DISCIPLINE ON GRADE RETENTION AND HIGH SCHOOL DROPOUT 2 (2011), https://civilrightsproject.ucla.edu/resources/projects/center-for-civil-rights-remedies/school-to-prison-folder/state-reports/the-economic-effects-of-exclusionary-discipline-on-grade-retention-and-high-school-dropout/marchbanks-exclusionary-discipline-ccrr-conf.pdf [https://perma.cc/9AZ2-VFEV].
[80] *Id.*

74. On June 18, 2024, at 10:10 a.m., Y.H. was traveling with a friend, M.B., from their usual classroom on the fourth floor of the school building to the auditorium on the first floor. They stopped on the second floor to get water from a water fountain.

75. Howard Weiner, a school aide ("SA") and hall monitor, was seated directly across the hall from the water fountain on the second floor. As Y.H. and M.B. walked towards the fountain, a teacher, Ms. Alfonso, passed Mr. Weiner and said, "hey babe." This comment prompted Y.H. to ask Mr. Weiner, "are you two dating?" Mr. Weiner responded, "that's none of your business."

76. Y.H. then proceeded to drink from the water fountain.

77. Mr. Weiner stood up to direct Y.H. and M.B. to leave the hallway and go to their class. He stood with M.B. directly behind Y.H. at the water fountain.

78. As Y.H. was still facing the fountain, Mr. Weiner told the students to take one of the "down" staircases to class (there were several staircases, each of which had a set direction of movement).

79. Because Y.H. had not been looking at Mr. Weiner when he directed them to a particular staircase, Y.H. pointed his finger in the direction he thought Mr. Weiner meant and turned around. As he turned around, the tip of Y.H.'s finger brushed Mr. Weiner's face. Neither Mr. Weiner nor M.B. saw Y.H.'s motion, but Mr. Weiner felt the brush against his cheek.

80. Mr. Weiner immediately asked Y.H., "why did you hit me?" Y.H. responded, "I'm sorry, it was by mistake." Mr. Weiner then took out his radio and asked all deans to report to the second floor for backup. Mr. Weiner then returned to his chair.

81. Assistant principal ("AP") Goldberg arrived, and Mr. Weiner told him that Y.H. had hit him. Y.H. was taken to AP Goldberg's office, where Y.H. explained that as he was turning around

from the water fountain, his finger had accidentally lightly touched Mr. Weiner's face. Despite the clarification, AP Goldberg accused Y.H. of striking a teacher intentionally.

82.   H.H., Y.H.'s mother, was called and told to pick Y.H. up from school because he had received a superintendent's suspension. When H.H. arrived at the school, she asked to speak with the principal and sent Y.H., who had been brought to meet her, back to class. After initially denying H.H.'s request, the principal met with H.H. and accused Y.H. of pushing Mr. Weiner to the ground – an allegation that was completely unsupported by any evidence. The principal appeared angry at H.H. for sending Y.H. back to class, and both H.H. and Y.H. were shortly thereafter escorted from the building. They were told to await further instruction.

83.   On June 20, 2024, H.H. received a letter stating that Y.H. was suspended from Bay Academy beginning immediately due to his presence in the school posing a continuing danger "to persons or property or an ongoing threat of disruption to the academic progress."

84.   Y.H. was charged with engaging in acts that constituted a "danger to the health, safety, welfare, and morals" of himself and others at the school when he "asked SA Weiner if he was dating Teacher Alfonso and then struck SA Weiner in the face."

85.   The letter informed H.H. that a Superintendent's Suspension Hearing would be held at the Brooklyn/Staten Island Office of Student Suspensions on June 26, 2024, the last day of the 2024-2025 schoolyear.

86.   In the interim, the letter instructed H.H. to send Y.H. to an alternative learning center ("ALC"), Albany, located in Brooklyn, New York.

87.   H.H. did not feel comfortable sending her son to a school and neighborhood she did not know. Out of concern for his safety, H.H. did not send Y.H. to the ALC while they waited for the hearing.

88.  A hearing was held on June 26, 2024, in front of Hearing Officer Michelle Parker ("HO Parker"). Bronx Legal Services appeared with Y.H. and his parent as counsel. Mr. Sean O'Neill, the Assistant Principal, presented the case on behalf of the school. The school brought only one witness, Mr. Weiner.

89.  Y.H. had been charged under the Student Code of Conduct with a B-52, which is "using force against or inflicting or attempting to inflict serious injury against school personnel." [81]

90.  Mr. Weiner testified that he had observed Y.H. and M.B. walking in the hallway and had instructed them to go to class. He testified that Ms. Alfonso had said, "hey baby!" to him, and then Y.H., who was at the water fountain, asked whether they were dating. Mr. Weiner testified that he responded that it was none of Y.H.'s business and then Y.H., who was standing very close to Mr. Weiner, slapped him on the left cheek. Mr. Weiner testified that he did not see what happened before the contact. He testified that while he believed the slap was intentional, he had no specific reasons to believe that was the case.

91.  Mr. Weiner testified that he did not receive medical attention or sustain any redness to his face.

92.  Y.H. did not testify himself, but his written statement was submitted as part of the school's evidence. It said: "Mrs. Alfonso said hey babe to Mr. Howard and I asked Mr. Howard if he's dating her and he started laughing then when I went to get water my arm swung and my finger tip hit the side of his face by accident and I apologized and said it was by mistake."

93.  In her closing statement, Y.H.'s attorney argued that the classification of a B-52 was inappropriate given that the touch had left no marks and required no medical attention. She argued

---

[81] *See* CITYWIDE BEHAVIORAL EXPECTATIONS at 42. The Discipline Code groups infractions into five levels based on the severity of the infraction, and gives each infraction type a distinct number from 1 to 62. For each code, there is a set level of possible consequences. Level 4 and 5 infractions can result in the longest possible suspensions. *See id.* at 31 – 43.

that there was no evidence presented that showed that Y.H. intentionally hit Mr. Weiner. Y.H.'s written statement explained that any contact had been accidental, and the presenting dean testified that Y.H. had said the same to all school personnel on the day of the incident.

94.   The school requested that Y.H. be suspended for 21-39 days.

95.   On June 28, 2024, H.H. received a letter stating that Y.H.'s suspension was sustained. Despite the evidence presented of the accidental and light nature of the contact between H.H. and Mr. Weiner, Hearing Officer Parker wrote that substantial and competent evidence had been presented to sustain the charge that "Respondent Y.H. had asked SA Weiner if the SA is dating Teacher Alfonso" and "Respondent struck SA Weiner in the face."

96.   The suspension was sustained for 16 school days. Y.H. would not be able to return to his school, Bay Academy, until three weeks into the new school year, on September 23, 2024.

97.   Y.H. and his mother were distraught at the thought of Y.H. missing the beginning of his 8th grade year. H.H. feared that if Y.H. missed the first three week of classes, he would never catch up academically.

98.   During the second week of July, H.H. received a call from someone who worked at an alternative learning center ("ALC") asking if Y.H. would be attending summer school. H.H. was confused because Y.H. had passed all his classes. The ALC staff member told H.H. that if Y.H. went to summer school, he could potentially serve all his suspension days such that he could return to Bay Academy for the first day of 8th grade.

99.   Y.H. attended the summer school and was therefore able to start 8th grade with his peers. However, it was a significant burden on Y.H. and H.H. to drive Y.H. to an ALC on Staten Island every day and prevented them from participating in other summer plans they had scheduled.

100. The suspension remains on Y.H.'s academic record.

Y.P.

101. Y.P. is a 14-year-old 9th grade student with a disability. When Y.P. was suspended in March 2024, she was in 8th grade at I.S. 96 Seth Low Intermediate School in Brooklyn, New York.

102.  Y.P. has an individualized education program ("IEP") with a disability classification of learning disability.[82]  She attends school in an integrated co-teaching ("ICT") classroom and receives the related service of counseling in a group one time per week for 40 minutes.

103.  On March 28th, 2024, Y.P. walked to school with two peers. As they were walking, one student, R.U., removed a vape pen from his pocket and took a puff. R.U. then attempted to put the vape pen in Y.P.'s sweater pocket, explaining that he was concerned he would get searched that day and did not want it on his person. Y.P. said no and pushed his hand away.

104.  Y.P. and R.U. entered the school building and went to their shared first period class. Because it was a testing day, all students were instructed to put their bags at the back of the classroom. Y.P. placed her bag alongside the other students' bags and sat at a desk located towards the front of the classroom, approximately eleven feet away from her backpack. R.U. sat three or four desk rows behind Y.P., near the bags in the back of the classroom.

105.  Approximately five minutes after the start of class, Rakym Felder, a school aide, entered the classroom and asked Y.P. to come with him. He had been instructed to escort Y.P. to another classroom for testing.

106.  Y.P. stood up and went to retrieve her bag from the back of the classroom. She grabbed the bag and walked towards Mr. Felder. As she passed R.U.'s desk, R.U. signaled to Y.P.'s bag with his hands and whispered "give it to me. Give me the vape."

---

[82] *See supra* ¶ 41.

107.  Y.P. stopped, opened her bag, and saw that there were two vape pens lying on top of her other schoolbooks. She had not known they were there. As Y.P. attempted to hand the vape pens to R.U., Mr. Felder grabbed them from her hand.

108.  Mr. Felder then took Y.P. to the school dean's office. When asked what happened, Y.P. told a dean, as well as several other school officials, that she had no knowledge of the presence of the vape pens in her bag and believed them to belong to R.U.

109.  R.F., Y.P.'s mother, was called and told to come get Y.P. immediately and await further instruction.

110.  On April 2, 2024, R.F. received a letter stating that Y.P. was suspended from her school, Seth Low, beginning immediately due to her presence in the school posing a continuing danger "to persons or property or an ongoing threat of disruption to the academic progress."

111.  Despite the DOE's awareness that R.F.'s primary language is Spanish, the suspension letter was written only in English.

112.  Y.P. was charged with engaging in acts that constituted a "danger to the health, safety, welfare, and morals" of herself and others at the school when on March 28, 2024, she "was in possession of a controlled substance, to wit: a vape pen containing marijuana."

113.  The letter informed R.F. that a Superintendent's Suspension Hearing would be held at the Brooklyn/Staten Island Office of Student Suspensions on April 9, 2024.

114.  In the interim, the letter instructed R.F. to send Y.P. to serve her suspension at the alternative learning center ("ALC"), Albany, located in Brooklyn, New York.

115.  To get to the ALC on her own, Y.P. would have had to travel for nearly an hour on two subways. R.F. did not feel comfortable with Y.P. traveling that far alone, so she drove Y.P. to and from the ALC every day, placing a significant burden on the family's schedule.

116.  At the ALC, the schoolwork consisted of a series of worksheets that Y.P. was to complete on her own, unrelated to the subjects Y.P. was learning at her usual school. Y.P. was told she could either complete them while she sat in a classroom at the ALC or take them home to do later. Teachers at the ALC did not teach lessons in a group format. Some days, Y.P. was told she could pick up the worksheets and leave immediately to go back home. Y.P. did not receive her IEP-mandated counseling while she was placed at the ALC.

117.  After adjourning the first hearing date to retain counsel, a hearing was held on April 15, 2024, in front of Hearing Officer Michelle Parker ("HO Parker"). Bronx Legal Services appeared with Y.P. and her parent as counsel. Tina Markland, the dean of Seth Low, presented the case and testified on behalf of the school. The school brought only one eyewitness, Mr. Felder.

118.  Mr. Felder testified that on March 28th, 2024, he had been tasked with escorting Y.P. from her classroom to another classroom for testing. He testified that when he arrived in the classroom and called for Y.P., she was sitting in her chair and her bag was on the back of her chair. Mr. Felder testified that Y.P. stood up, grabbed her bag, and as she walked toward Mr. Felder, Y.P. reached inside her bag to remove two items and attempted to hand them to another student. The other student would not take them and said "No, I'm not getting into trouble."

119.  Dean Markland testified that when Y.P. entered her office with Mr. Felder, she had two vape pens in her hand. Dean Markland testified that when Y.P. was asked where the pens came from, she stated that they were R.U.'s. Upon looking at the items, Dean Markland determined that one pen was empty and the other had liquid inside it. She then gave the pens to a school safety agent. No further tests were performed on the pens to determine their contents.

120.  No photos of the vape pens or verified information about their contents were entered as evidence at the hearing.

121.  Y.P. testified on her own behalf. As described above, she testified in relevant part that while walking to school, she saw R.U. take a hit of his vape pen and then attempt to put it in Y.P.'s sweater pocket. After entering their first period classroom, Y.P. placed her bag at the back of the classroom and sat down at her desk. Y.P. testified that when Mr. Felder called for her to come with him, she returned to the back of the classroom to grab her bag and that as she walked past R.U., he whispered to her, "give me the vapes" while gesturing towards her bag.

122.  Y.P. testified that her bag is like a pocketbook, in that it is mostly open at the top with a magnetic clasp in the middle.

123.  The school requested that Y.P. be suspended for 16-20 days.

124.  On April 18, 2024, R.F. received a call stating that Y.P.'s suspension had been sustained for 10 school days.

125.  Despite Y.P.'s testimony that the pens were not hers and the lack of any evidence presented as to the contents of the liquid in the pen, or any images of the actual items, Hearing Officer Parker found that substantial and competent evidence had been presented to sustain the charges that Y.P. was in possession of "a controlled substance, namely liquid THC in a vape pen, and in possession of drug paraphernalia, namely an empty vape pen."

126.  The extended period for which Y.P. was excluded from school deepened her preexisting academic struggles. At the time of the suspension, Y.P. was failing four out of her six courses. She began to exhibit chronic absenteeism due to a lack of motivation to attend school. She was told throughout the rest of the 2023-2024 school year that she likely would not graduate 8th grade with her peers.

127.  Y.P. was prohibited from attending the 8th grade prom and class trip to Six Flags as further punishments, two rites of passage that she had been looking forward to.

128.  Y.P. and R.F. were not told until the morning of graduation that Y.P. would in fact be permitted to graduate. Y.P. was unable to enjoy this momentous day because of the significant anxiety the uncertainty had caused her, and the embarrassment of showing up late to the ceremony due to the last-minute notification, a clear indication that she almost failed the 8th grade.

129.  Since the beginning of the 2024-2025 school year, Y.P. has continued to struggle with motivation to attend school. R.F. must drive Y.P. to school every day because she will not go otherwise. R.F. is also considering transferring Y.P. to a charter school in the hopes that a change might make Y.P. excited to go to school again. Y.P. is currently failing all her classes, except for art, and her promotion to the 10th grade is in doubt.

H.C.

130. H.C. is a 12-year-old 7th grade student with a disability classification of emotional disability ("ED"). She attends a community school in a self-contained 12:1 special education classroom and receives the related service of counseling twice a week, once individually and once in a group.

131. When H.C. was suspended in December 2024, she attended Pugsley Preparatory Academy ("Pugsley") in the Bronx, New York, and had a disability classification of learning disability ("LD").

132. At the beginning of the 2024-2025 schoolyear, H.C. began to exhibit disruptive behaviors in the classroom. To identify and implement additional supports for H.C., Timothy Woo, H.C.'s guidance counselor, conducted a functional behavioral assessment ("FBA"), a process used to understand, via observation and analysis, how and why a student engages in behaviors that impede

his or her learning.[83]  The FBA noted that H.C. was most likely to exhibit problem behaviors such as using combative and inappropriate language when she is given a directive – such as to put her phone away – or told to perform a non-preferred or difficult task.

133. On December 4, 2024, around 12:50 p.m., H.C. was upset about a comment made by a friend and was speaking with Mr. Woo outside of his office. H.C. frequently spoke to Mr. Woo when she felt emotionally overwhelmed. Ms. Went, H.C.'s classroom teacher, called from across the hallway for H.C. to come to class because the class period had started.

134. H.C. entered the classroom and went to her assigned desk. The class was doing a quiet assignment for the beginning of the period. H.C. still felt upset, and therefore asked Ms. Went if she could look at her phone for a few minutes, a common coping mechanism used by H.C. Ms. Went gave H.C. permission to take out her phone.

135. Melanie Robles, an English Language Learner teacher, was nearby working with another student. Ms. Robles is not usually in Ms. Went's classroom and does not work with H.C.

136. Although Ms. Went had just given H.C. permission to be on her phone, Ms. Robles said to H.C., "little girl, get off your phone." When H.C. did not respond, Ms. Robles continued to command H.C., with continuing intensity, and the repeated use of the phrase "little girl," to put her phone away.

137. Because Ms. Robles would not stop demanding that H.C. put her phone away, H.C. said to Ms. Robles, "Leave me alone" and Ms. Robles responded, "Not today, H.C." H.C. became extremely upset, got up from her seat, and began pacing around the classroom. Ms. Robles stood

---

[83] This document is then used to create a behavioral intervention plan ("BIP") which includes a description of the purpose and antecedents of student's maladaptive behaviors as well as actions school staff can take to reduce triggers of behaviors and to address behaviors once they occur.

and continued to berate H.C., calling her a "bitch." After being called a "bitch" by Ms. Robles, H.C. responded with profanities herself and called Ms. Robles a "bitch."

138. Seeing that the situation was escalating and H.C. was in crisis, Ms. Went called the assistant principal's office to ask for assistance and asked another student to go get Mr. Woo from his office. Mr. Woo entered the classroom shortly thereafter.

139. As H.C. stood at the back of the room, she told Ms. Robles that she would spit on her. Ms. Robles mockingly responded, "ooh, so scared," which further upset H.C. H.C. then spit towards Ms. Robles from approximately six feet away.

140. Ms. Robles then initiated a physical altercation, lunging towards H.C., grabbing her hair, and beginning to punch H.C. while the students in the classroom watched.

141. Mr. Woo attempted to step between H.C. and Ms. Robles. He faced Ms. Robles and told her to stop hitting H.C. Eventually, after approximately one minute, Mr. Woo was able to separate Ms. Robles and H.C. In separating them, he injured his right hip.

142. H.C. was removed from the classroom and taken to Mr. Woo's office, where Mr. Woo observed a cut on the right side of her neck and a cut on her upper lip.

143. Mr. Woo called H.C.'s mother, N.T., to let her know that there had been an incident, but N.T. was unable to pick H.C. up right away. H.C. remained in Mr. Woo's office until the end of the school day. N.T. was then told to keep H.C. home until further notice.

144. Mr. Woo spoke with several students who had witnessed the attack on H.C. One, A.G., told Mr. Woo he felt scared to come to school. Another, S.Q., told Mr. Woo that he did not want to go to school the next day because he feared Ms. Robles after having seen her hit H.C. in the head.

145. On December 6, 2024, N.T. received a letter stating that H.C. was suspended from school beginning immediately due to her presence in the school posing a continuing danger to "persons or

property or an ongoing threat of disruption to the academic progress." H.C. was charged with engaging in acts that constituted a "danger to the health, safety, welfare, and morals" of herself and others at the school. The suspension letter alleged that H.C. "engaged in harassing and intimidating behavior when she stated to Teacher Ms. Robles, 'shut the fuck up bitch,' 'I don't give a fuck bitch' and 'fuck you bitch'" and "engaged in physically aggressive behavior when she grabbed Teacher Ms. Robles by her shirt, scratched Ms. Robles in the nose, spat on Ms. Robles's face, and attempted to pull Ms. Robles to the floor."[84] The letter informed N.T. that a suspension hearing would be held on December 12, 2024, at 9:00 a.m.

146. In the interim, the letter instructed N.T. to immediately begin sending H.C. to an alternative earning center ("ALC"). N.T. could not drop off or pick up H.C. at the ALC herself because she works a full-time job, and did not feel comfortable sending H.C. alone on public transit to an unfamiliar neighborhood and school. She also was concerned that H.C.'s special education services would not be provided. Therefore, N.T. decided not to send H.C. to the ALC, and H.C. did not attend any school beginning on December 6, 2024.

147. A Superintendent's Suspension hearing was held at the Bronx Office of Student Suspensions on December 12, 2024. Hearing Officer Larry Arias ("HO Arias") presided over the hearing. Niurka Grullon, the dean of Pugsley, presented the case on behalf of the school. The school brought only one witness who was present at the time of the incident, Ms. Went.  Neither Mr. Woo nor Ms. Robles were called as witnesses; nor were any other students present in the classroom at the time of the incident.

148. In her testimony, Ms. Went stated that yelling began between H.C. and Ms. Robles after Ms. Robles told H.C. to put her phone away. She testified that it escalated very quickly. Ms. Went

---

[84] A third charge against H.C. stemming from the same incident was not sustained due to the school's failure to present any relevant, non-hearsay evidence.

testified that she heard H.C. say, "leave me alone." Ms. Robles responded, "not today, H.C." H.C. then said, "shut the fuck up. Leave me alone. I'm not putting away my phone. Mind your business, bitch." She testified that she saw Ms. Robles stand up and H.C. spit towards Ms. Robles.

149. Ms. Went testified that she did not see whether Ms. Robles or H.C. initiated contact or how the physical altercation began. She testified that she did not see H.C. grab Ms. Robles's shirt and was not sure whether H.C. ever made contact with Ms. Robles' face. She described the incident as a "tussle" and "fight" where both H.C. and Ms. Robles were holding onto each other and could have fallen to the floor. She testified that afterwards she saw a scratch on Ms. Robles' face.

150. The only other evidence submitted by the school was a set of signed written statements from Ms. Went, Ms. Robles, Mr. Woo, and four students: Y.P., J.C., A.G., and S.K.

151. Although Ms. Went testified that she was not sure who initiated the physical altercation, other evidence presented at the hearing indicated that it was Ms. Robles who attacked H.C: Mr. Woo wrote in a statement submitted into evidence that "Ms. Robles approached H.C. and began to grab and punch H.C. I tried to jump between them while facing Ms. Robles and trying to tell her not to do it but was unable to keep them apart." One student, J.C., wrote that "Ms. Robles got up and started to fight H.C." Another student, S.K., wrote that "There was a fight between a student and a teacher. It was a student named H.C. and a teacher named Ms. Robles. The student spit on the teacher's face. Then the teacher got mad and started hurting her and cursing H.C. out."

152. H.C. testified on her own behalf. As described above, she testified in relevant part that Ms. Went gave her permission to go on her phone at the beginning of class. Then, Ms. Robles demanded she put her phone away several times using the language "little girl." When H.C. continued to use her phone, Ms. Robles called her a "bitch." H.C. became upset and told Ms. Robles she would spit on her, and after Ms. Robles mocked her, H.C. spit towards Ms. Robles. Ms.

Robles, who is a foot taller than H.C., then initiated the physical altercation, lunging at H.C. H.C. testified that Ms. Robles grabbed her high ponytail and held onto it for approximately one minute while the two struggled. H.C. testified that apart from kicking at Ms. Robles to get her to release her head, she never initiated physical contact; she never swung at Ms. Robles with her hands nor grabbed Ms. Robles's shirt.

153. H.C. testified that she had two cuts – one on the back of her neck and one on her lip. Hearing Officer Arias observed these injuries during the hearing.

154. The school requested that H.C. be suspended for 40-180 days.

155. A Manifestation Determination Review ("MDR") was held for H.C. on December 17, 2024.  The school team ultimately concluded that the behavior was not a manifestation of H.C.'s disability.

156. On December 19, 2024, N.T. received a letter stating that H.C.'s suspension had been sustained and would continue for 17 school days.

157. Despite the extensive evidence presented at the hearing demonstrating that the teacher had been the instigator of the verbal altercation and initiator of the physical contact, Hearing Officer Arias found that substantial and competent evidence had been presented to sustain the charge that H.C. engaged in physically aggressive behavior "when she tussled with Teacher Ms. Robles, scratched Ms. Robles in the nose, spat on Ms. Robles's face, and attempted to pull Ms. Robles to the floor."  He also found that H.C. engaged in "harassing and intimidating behavior when she stated to Teacher Ms. Robles, 'shut the fuck up bitch,' 'I don't give a fuck bitch' and 'fuck you bitch.'"

158. H.C. did not attend any school for the duration of the suspension. She began attending her school, Pugsley, again on January 13, 2025.

159. Less than a week after H.C. returned to Pugsley, she received an in-school suspension for allegedly speaking disrespectfully to an assistant principal. She spent three days in a secluded classroom.

160. N.T. continued to receive calls from the school on a weekly basis about small infractions H.C. had committed. She believed that H.C. continued to lash out at teachers and administrators due to the feeling that she was being unfairly punished. Mr. Woo reached out to N.T. several times in January and February asking when she planned to transfer H.C. to another school, leaving N.T. and H.C. feeling as if the school wanted H.C. gone. In March 2025, N.T. removed H.C. from Pugsley because she felt the school was hurting H.C.'s academic potential by repeatedly singling her out for punishment and thus interfering with her classroom learning time.

161. The extended period for which H.C. was excluded from school and the continued punishments have deepened her academic and behavioral struggles. N.T. recently received a "promotion in doubt" letter from the NYC DOE indicating that because of H.C.'s academic standing, she risks not being promoted to the 8th grade.

162. The suspension remains on H.C.'s academic record.

## CAUSE OF ACTION

163. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

164. Plaintiffs have property and liberty interests in their education created pursuant to Section 1 of Article XI of the New York Constitution.

165. Defendants have violated Plaintiffs' due process rights under the United States Constitution by subjecting them to an unconstitutional standard of proof in their student disciplinary hearings.

166. By applying a "substantial and competent evidence" standard at such hearings, Defendants failed to provide adequate procedural protections proportionate to the risk of erroneous deprivation and the magnitude of harms tied to a long-term suspension. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

167. Defendants' failure to apply a constitutional standard of proof caused Plaintiffs to suffer actual damages including but not limited to mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, as well as other economic and non-economic damages.

168. Applying a preponderance of the evidence standard would not place any greater administrative burden on Defendants but would significantly enhance procedural protections for vulnerable students.

169. All Defendants are state actors acting under color of state law within the meaning of 42 U.S.C. § 1983.

## **REQUEST FOR RELIEF**

**WHEREFORE**, plaintiffs respectfully request that the Court:

A. Declaring that the "competent and substantial evidence" standard used by Defendants is unconstitutional as applied to student discipline hearings for suspensions longer than five school days;

B. Directing Defendants to employ the "preponderance of the evidence" standard in all long-term suspension hearings;

C. Awarding Plaintiffs damages in an amount to be determined at trial;

D. Awarding Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

E.  Granting such additional or further relief as the Court considers just and proper.


Dated: Bronx, New York
        May 20, 2025

                                                  Respectfully submitted,

                                                  s/Christopher D. Lamb

                                                  Christopher D. Lamb, Esq.
                                                  Nelson Mar, Esq.
                                                  Nanette Schorr, Esq.
                                                  Michaela Shuchman, Esq.
                                                  BRONX LEGAL SERVICES
                                                  349 E. 149th Street
                                                  Bronx, New York 10451
                                                  (718) 928-3723
                                                  clamb@lsnyc.org

                                                  Kate DiVasto, Esq.
                                                  QUEENS LEGAL SERVICES
                                                  89-00 Sutphin Boulevard
                                                  Queens, New York 11435
                                                  (347) 592-2104
                                                  kdivasto@lsnyc.org

                                                  Attorneys for Plaintiffs